## Board of Public Education School District of Philadelphia, Appellant, *v.* Beilan.

Argued November 30, 1955; reargued January 12, 1956. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

reargument refused October 3, 1956.

*C. Brewster Rhoads,* with him *Sidney L. Wickenhaver* and *Edward B. Soken,* for appellant.

*Thomas D. McBride,* with him *John Rogers Carroll,* for appellee.

*Thomas A. Masterson* and *Julian E. Goldberg,* filed a brief for the American Civil Liberties Union, Greater Philadelphia Branch, under Rule 46.

**84**

OPINION BY MR. JUSTICE CHIDSEY, June 25, 1956:

Herman A. Beilan, a professional employe of the School District of Philadelphia, taught English for the Simon Gratz High School. He had been a teacher in the District for about 23 years. At the written request of Dr. Louis P. Hoyer, Superintendent of the Philadelphia Public Schools, Beilan reported to the Superintendent's office for an interview on June 25, 1952. Dr. Hoyer advised Beilan that he had information bearing on the question of the latter's loyalty and wanted to know whether the information was correct. Mr. Beilan suggested that the Superintendent ask the questions, whereupon Dr. Hoyer asked whether Mr. Beilan was Press Director of the Professional Section of the Communist Political Association in 1944. Beilan did not answer the question but stated he wanted to consult counsel. Dr. Hoyer acceded to this request and stated that he wanted Beilan to report again after he had consulted counsel. There the matter rested until Dr. Hoyer made a written request in October that Mr. Beilan report to the Superintendent's office on October 14th to further discuss matters already brought to Beilan's attention. Beilan came to the Superintendent's office and stated that he had consulted counsel and had been advised that he could not legally answer the question asked about his Communist activity in 1944 or similar questions. Dr. Hoyer advised Mr. Beilan that this was a very serious and important matter and that failure to answer might lead to his dismissal. Beilan, however, persisted in his refusal.

On November 18, 1953 Beilan testified before a sub-committee of the House Committee on Un-American Activities of the House of Representatives of the United States Congress. He testified to his educational and employment background. When asked by the Committee whether he had ever been a member of the Commu-

nist Party, Mr. Beilan pleaded the privilege of the Fifth Amendment of the Federal Constitution. Counsel for the Congressional Committee stated that the Committee had received sworn testimony that Mr. Beilan was a member of the Communist Party; that in 1943 and 1944 he was a member of the Daily Worker Press Club; that he was Press Director of the Professional Section of Section 8 of the Communist Political Association in 1944; that he was Secretary of Section 8 of the Communist Political Association in 1945; that he was a member of the Communist Party and held membership book number 78343 in 1944; that he held membership book number 87591 in the Communist Party in 1945; that he was organizer of the Professional Section of the Communist Party of Eastern Pennsylvania and Delaware in 1946 and 1947; that he was a member of the International Workers Order (an organization cited by the U. S. Attorney General as subversive) in 1947 and 1949. He was asked separately about each of these activities. In each case he refused to answer and relied on the protection of the Fifth Amendment.

On December 22, 1953 the Board of Education conducted a formal hearing which was private at Mr. Beilan's request.[1] Beilan, who was represented by counsel, did not testify in his own behalf. The hearing was conducted pursuant to a resolution passed by the Board wherein Beilan was charged under Section 1122 of the Public School Code of 1949, Act of March 10,

---

[1] The court below refers to the interval which elapsed between the interviews by the Superintendent and the institution of charges and hearing thereon. A substantial number of other teachers refused to respond to similar inquiries made by Dr. Hoyer, the Superintendent of Schools. No charges were preferred against any of them by the School Board until all had been interviewed. Counsel for appellant states in his brief that, as in Beilan's case, the interviews were conducted privately so that the teachers would not be embarrassed by publicity and that this took a great deal of time.

1949, P. L. 30, 24 PS §11-1122, with incompetency and persistent and wilful violation of the school laws. The charge of incompetency was based on two counts, one, Mr. Beilan's conduct in refusing to respond to the Superintendent's inquiry as to his loyalty and the other his conduct in refusing to respond to the Congressional Committee's inquiry as to his alleged Communist affiliations, to which he invoked the Fifth Amendment. On January 7, 1954 by a vote of 14 to 1, the Board held that the charges had been sustained and ordered Mr. Beilan's discharge. Beilan appealed to the Superintendent of Public Instruction of the Commonwealth, who upheld the action of the Board. Beilan then appealed to the Court of Common Pleas of Philadelphia. His appeal was heard on the record and no further testimony was taken. The court reversed the order of the Superintendent of Public Instruction and set aside Mr. Beilan's dismissal. This appeal followed. Extended briefs were filed on behalf of appellant and appellee, and the American Civil Liberties Union filed a brief under Rule 46 urging affirmance.

From the opinion of the court below it appears that its decision was based first on the ground that the charges did not come within the purview of the School Code, and second that ". . . the proceedings before the Board of Education were actually concerned solely with the question of appellant's [Beilan's] suspected disloyalty. . . .". We disagree with both of these conclusions.

Considering them in reverse order, we find absolutely no support for the second conclusion reached by the court below.[2] It not only impugns the good faith

---

[2] In its opinion the court states: "The school authorities obviously desired to dismiss appellant because they suspected him of disloyalty." and "The Tenure Act was utilized as an expedient shortcut.".

of the members of the Board but completely brushes aside the record which consistently from beginning to end irrefutably demonstrates that appellee was not dismissed for subversion or disloyalty but for refusal to answer pertinent questions bearing directly upon his fitness as a teacher and, therefore, his competency. This is clear from the charges, the testimony adduced and the rulings of the Chairman of the Board who presided at the hearing. The issue before the Board was expressly defined and limited at the outset of the hearing by counsel for the Board and counsel for the appellee who were in complete agreement in this regard.[3] The court's conclusion is the more difficult to understand in view of the statement in its opinion that "Appellant was not dismissed on the ground that he advocates or participates in subversive doctrines. His contract of employment was terminated on the alleged grounds of incompetency as a teacher and of wilful and persistent violation of the school laws.", and later in its opinion that ". . . the testimony presented at the hearing related merely to appellant's refusal to answer questions, and

---

[3] Counsel for the School Board stated: "I am not asking this Board in this proceeding or any other proceeding that I know of to pass upon the loyalty or disloyalty of this particular teacher. I am saying that the things which this teacher did in connection with his professional obligations were such as to result in incompetency sufficient to discharge the teacher under the School Code.", and counsel for Mr. Beilan stated: "Mr. President, if you please, I have no intention of seeing this proceeding become a loyalty hearing. Mr. Rhoads [counsel for the School Board] has stated that it is not. I agree with him completely . . .". Later in the hearing, counsel for Mr. Beilan also stated: "We have no intention of making a loyalty proceeding of this hearing. We agree with Mr. Rhoads and Mr. Weinrott [a member of the Board] who stated that the only issue is whether this particular man refused to answer certain particular questions and whether, as a matter of law, that amounts to a ground for dismissal. . . .".

no attempt was made to prove that appellant was actually a Communist or otherwise disloyal.".

We turn to the conclusion of the court below that the charges against appellee did not come within the grounds for dismissal set forth in the School Code of 1949, supra. Under the Act of May 18, 1911, as amended by the Act of June 20, 1939, P. L. 482, the grounds for dismissal of a teacher were "immorality, incompetency, intemperance, cruelty, persistent negligence, mental derangement, and persistent and wilful violation of the school laws of this Commonwealth". The School Code of 1949 added as an additional ground for dismissal "advocation of or participating in un-American or subversive doctrines". In 1951 there was enacted the Loyalty Act, sometimes called the Pechan Act, which provides for the removal of subversives in all areas of public service. Section 16 of this Act repealed Section 1122 of the School Code of 1949 in so far as it authorized dismissal of a teacher for "advocation of or participating in un-American or subversive doctrines". All other grounds for dismissal, including incompetency, remained in force as theretofore. If the appellee had been charged with being a subversive it may be conceded that the Loyalty Act should have been employed, but this was not the charge. *Appellee was charged with incompetency based on his refusal to respond to a pertinent inquiry as to his fitness to be a teacher.* The Loyalty Act preempted the field of dismissal for subversion as therein defined, but other causes of dismissal remained unaffected. Section 15 of the Loyalty Act expressly provides: "The provisions of this act shall not affect the right to discharge any person for any cause other than those provided for by this act or without cause under existing law. . . .". Moreover the Loyalty Act provides neither the procedure nor the substantive

law with respect to the duty of a teacher to answer proper questions. The provisions of the School Code do provide the basis for dismissal of a teacher who refuses to answer such questions.

We have held that incompetency as a cause for dismissal is to be given a broad meaning. In *Horosko v. Mount Pleasant Township School District et al.,* 335 Pa. 369, 6 A. 2d 866, Mr. Justice LINN, speaking for the Court. at pps. 374-375 said: "The term 'incompetency' has a 'common and approved usage'. The context does not limit the meaning of the word to lack of substantive knowledge of the subjects to be taught. Common and approved usage give a much wider meaning. For example, in 31 C. J., with reference to a number of supporting decisions, it is defined: 'A relative term without technical meaning. It may be employed as meaning disqualification; inability; incapacity; lack of ability, legal qualifications, or fitness to discharge the required duty.' In Black's Law Dictionary (3rd edition) page 945, and in Bouvier's Law Dictionary (3rd revision), p. 1528, it is defined as 'Lack of ability or fitness to discharge the required duty.' Cases construing the word to the same effect are found in Words and Phrases, 1st series, page 3510, and 2nd series, page 1013. Webster's New International Dictionary defines it as 'want of physical, intellectual, or moral ability; insufficiency; inadequacy; specif., want of legal qualifications or fitness.' Funk & Wagnalls Standard Dictionary defines it as 'General lack of capacity of fitness, or lack of the special qualities required for a particular purpose.' ".

Certainly a teacher who refuses to respond to a pertinent inquiry relative to his fitness to teach is not competent within the broad reach of that term, whether the inquiry concerns loyalty or any other proper subject of

inquiry. Frankness and cooperation with an administrative superior bear directly upon a teacher's competency. They are as essential in one occupying a post of public trust and civic responsibility as academic qualifications. Can it be seriously argued that where the superintendent of schools has trustworthy information indicating that a teacher has an incurable communicable disease or that he is a peddler of narcotics or, as here, that he may entertain Communistic ideologies which could be transmitted to the youth in his care, that no inquiry can be made as to the fact and that the teacher is not required to respond? As well stated in the brief of counsel for the appellant: ". . . The State Constitution requires the General Assembly to maintain a thorough and efficient system of public schools. The School Code is the legislative implementation of this Constitutional duty. The rights and duties of a Superintendent have grown with custom and with professional usage. Many of his duties are imposed on him by tradition. It is one of his duties under the School Code to make sure that the teaching staff is competent, and therefore to weed out professionally unfit teachers. This is a continuing process that the Superintendent carries on. The Superintendent has the power and the duty, whenever the facts indicate the need, to inquire into and reevaluate the fitness of a teacher.". Unquestionably there is a reciprocal duty on the part of the teacher to fully and frankly cooperate. He may not block such proper inquiry by secretiveness or concealment.

In *Adler et al. v. Board of Education of the City of New York,* 342 U. S. 485, the majority opinion of the U. S. Supreme Court by Mr. Justice MINTON, upholding the constitutionality of the Feinberg Law which prohibits employment of members of subversive organiza-

tions in the public schools of the State of New York, stated at p. 493: ". . . A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted."

In the instant case the court characterized appellee's conduct as "misguided secretiveness and lack of candor", which it said it did not condone. The secretiveness consisted of a deliberate and insubordinate refusal to answer the questions of his administrative superior in a vitally important matter pertaining to his fitness. Such conduct stamped him with incompetence as a professional employe in the public schools.

The court below states that the Superintendent's query related to a political association alleged to have occurred eight years prior to the interview and that appellee's refusal to answer "that question" was obviously not relevant to the issue of his present competency. The court overlooks the fact that appellee not only refused to answer the question put to him, but any similar questions. From the testimony it is obvious that the question asked by the Superintendent was the forerunner of other similar questions, the asking of which was effectually thwarted by appellee's refusal to answer any questions of similar import. Moreover, the one question asked, that is, whether appellee had been Press Director of the Professional Section of the Communist Political Association, was a most significant one and although dating back to 1944, was pertinent and of importance for determination whether the affili-

ation still existed, or if not, the circumstances under which it had terminated. Inquiry into appellee's past activities was relevant to his present fitness. It is unnecessary to rely only upon the statement of Dr. Francis B. Haas, Superintendent of Public Instruction and an eminent educator, that in sustaining a teacher's dismissal, past activities are relevant to present fitness, for such has been unequivocally declared by the U. S. Supreme Court. In *Adler et al. v. Board of Education of the City of New York* (1952), supra, the Court stated: "... One's associates, past and present, as well as one's conduct, may properly be considered in determining fitness and loyalty. From time immemorial, one's reputation has been determined in part by the company he keeps. In the employment of officials and teachers of the school system, the state may very properly inquire into the company they keep, and we know of no rule, constitutional or otherwise, that prevents the state, when determining the fitness and loyalty of such persons, from considering the organizations and persons with whom they associate.".

In *Garner et al. v. Board of Public Works of Los Angeles et al.*, 341 U. S. 716 (1951), the U. S. Supreme Court upheld a statutory requirement of the City of Los Angeles that city employes disclose, under affidavit, any past or present Communist membership. Certain employes had taken the loyalty oath required by the same law, but refused to furnish the information required in the affidavit. In the opinion of the Court it is stated, p. 720: "We think that a municipal employer is not disabled because it is an agency of the State from inquiring of its employees as to matters that may prove relevant to their fitness and suitability for the public service. Past conduct may well relate to present fitness; past loyalty may have a reasonable relationship to present and future trust. Both are com-

monly inquired into in determining fitness for both high and low positions in private industry and are not less relevant in public employment."

In the recent case of *Slochower v. Board of Higher Education of New York City*, 350 U. S. 551 (1956), Slochower had been dismissed by the Board as an associate professor at Brooklyn College under a section of the City Charter which provided: ". . . that, whenever a city employee utilizes the privilege against self-incrimination to avoid answering before a legislative committee a question relating to his official conduct, 'his term or tenure of office or employment shall terminate and such office or employment shall be vacant, and he shall not be eligible to election or appointment to any office or employment under the city or any agency.' . . .". In setting aside the dismissal, Mr. Justice CLARK, who delivered the opinion of the Court, pointed out that dismissal under the section was automatic, with no right to charges, notice, hearing or opportunity to explain, and thus lacking in due process. In its opinion the Court referred to the *Garner* case. In distinguishing it from the case at hand the Court stated at p. 556: ". . . Garner v. Los Angeles Board, 341 U. S. 716, 720, upheld the right of the city to inquire of its employees as to 'matters that may prove relevant to their fitness and suitability for the public service,' including their membership, past and present, in the Communist Party or the Communist Political Association. There it was held that the city had power to discharge employees who refused to file an affidavit disclosing such information to the school authorities.". And again at p. 558: "It is one thing for the city authorities themselves to inquire into Slochower's fitness, but quite another for his discharge to be based entirely on events occurring before a federal committee whose inquiry was announced as not directed at 'the property, affairs, or gov-

ernment of the city, or . . . official conduct of city employees.' In this respect the present case differs materially from Garner, where the city was attempting to elicit information necessary to determine the qualifications of its employees. . . .".

Following the erroneous concept of the issue by the court below, much of the argument of counsel for appellee proceeds upon the unwarranted assumption that appellee was charged with subversion. In the *Slochower* case the Supreme Court reaffirmed its ruling in an earlier case that the privilege of self-incrimination is not the equivalent of a confession of guilt or conclusive presumption of perjury. If appellee had been charged with subversion, his reliance upon the Fifth Amendment at the Congressional hearing would not have established his disloyalty. But the charge here was not disloyalty but incompetency, based on his refusal to respond to inquiry pertaining to his fitness.

There were three charges against the appellee and if any one of them was sustained, his dismissal was justified. We are satisfied that his refusal to answer the inquiry of his administrative superior constituted incompetency within our definition of that term. We therefore deem it unnecessary to pass upon the other charges preferred, based upon his refusal to answer questions before the Congressional Committee and on persistent and wilful violation of the school laws. Appellee cites *Wieman et al. v. Updegraff et al.*, 344 U. S. 183, where the Supreme Court held that dismissal of governmental employes for failure to take the loyalty oath prescribed by an Oklahoma statute was lacking in due process. Mr. Justice CLARK, in discussing the *Wieman* case in his opinion in the *Slochower* case, pointed out that the Oklahoma loyalty oath based non-employability solely on the fact of membership in certain organizations, that such membership might be in-

nocent and that "the classification of innocent and guilty together was arbitrary". In the *Wieman* case Mr. Justice CLARK reconciled the decision in the *Garner* case where the loyalty oath involved did not expressly require knowledge of the aims and purposes of the Communist Party or Communist Political Association by stating that scienter was implicit in each clause of the oath and that it was assumed in *Garner* that Los Angeles would give the petitioners who had refused to sign the oath an opportunity to take it as interpreted and resume their employment. In *Wieman* failure to take the proscribed oath automatically disqualified persons from public employment. They were afforded no opportunity to explain that during their affiliation with a proscribed organization they were innocent of its purpose. In the instant case full opportunity was afforded to appellee to deny his affiliation with any Communist body, or if such existed, that he did not know of the organization's aims and objectives or that he had completely disassociated himself from any such affiliation. Unquestionably an affirmative answer to the Superintendent's question about a past subversive affiliation would have been followed by inquiry whether such affiliation or other affiliations still existed, or if they had been discontinued, when and under what circumstances. This would have been a normal course of inquiry. We know of no case where a teacher has been dismissed who has entirely discarded past subversive affiliations and has abided by a loyalty oath taken in good faith. Both the *Garner* and the *Wieman* cases uphold the right of the public employer to inquire into the employe's fitness. The provisions with respect to the loyalty oaths there involved embodied a complete inquiry. In the instant case appellee manifested his recalcitrance at the initial question asked. He refused to answer *any* questions of the Superintendent bearing

on the subject matter. Thus he completely thwarted *any* inquiry. The inquiry was blocked at the threshold and was rendered completely abortive.

Appellee also contends that the Superintendent was not authorized to make the inquiry. There is no more important branch of government than the administration of our public school system. It is a continuing process of education for the maintenance of our democracy. The right of a superintendent of schools to reevaluate a teacher's fitness to be retained in his position is inherent and need not be expressly authorized by statute or local rule or regulation. In a private school the refusal to respond to a pertinent inquiry as to a teacher's fitness made by the superintendent or head of the institution certainly would not be tolerated, but would result in the teacher's discharge. A public school should not be placed in an inferior position in this regard. While the tenure provisions of the School Code protect teachers in their positions from political or other arbitrary interferences, they were not intended to insulate them from proper inquiry as to their fitness and their discharge for failure to cooperate with their superiors in authority to the detriment of the efficient administration of the public school system. The School Code expressly provides that incompetence shall be a cause for dismissal and under the broad meaning properly ascribed to that term, appellee rendered himself incompetent as a member of the school organization.

Counsel for appellee refers to our decision in *Commonwealth ex rel. Roth v. Musmanno,* 364 Pa. 359, 72 A. 2d 263; *Schlesinger Petition,* 367 Pa. 476, 81 A. 2d 316; *Matson v. Jackson,* 368 Pa. 283, 83 A. 2d 134. In the *Roth* case we held that the privilege of serving as a juror may not be extinguished, abated or diminished by any proceeding lacking in due process. In the *Schlesinger* case we similarly held that the privilege of

an attorney to practice his profession could not be extinguished, abated or diminished without a proceeding conforming to due process. In the *Matson* case we held that the Administrative Code does not confer any authority upon the Attorney General to conduct a public hearing into the alleged Communistic leanings of a district attorney. In the instant case the School Code authorized the dismissal of a teacher for incompetency and prescribed at length the procedure with respect thereto. Under its provisions appellee was notified in writing of the charges against him. He received a hearing before the Board of Education and exercised the right given him to appeal to the State Superintendent of Public Instruction and thereafter to the court. It cannot be claimed, therefore, that his dismissal was without due process of law.

In refusing to answer the Superintendent's inquiry appellee asserted no constitutional right or privilege. The Superintendent had the power, if not indeed the duty, to make the inquiry, and appellee had the duty to cooperate by answering freely and frankly. His defiant conduct in refusing to respond justified his dismissal on the ground of incompetency.

The order of the court of common pleas is reversed and the order of the State Superintendent of Public Instruction affirming appellee's dismissal by the Board of Public Education is sustained at the cost of appellee.

---

CONCURRING OPINION WITH RESERVATION BY MR. JUSTICE MUSMANNO:

I concur in the decision in this case and with all that is said in the Opinion of the Court with the exception of the citation of the two cases of *Commonwealth ex rel. Roth v. Musmanno*, 364 Pa. 359, and *Schlesinger*

*Petition,* 367 Pa. 476. I file this short Opinion only because I would not want my approval of the decision to be interpreted as an acquiescence in the citation of those two cases as authority for the conclusions contained therein. In my view of the matter, those two cases were badly decided and, therefore, do not represent the law. I believe that counsel for the defendant here were fully justified in advancing the *Roth* and *Schlesinger* decisions in support of their erroneous position that Beilan was not accorded due process of law, because if Alice Roth, in her case, was not accorded due process of law, then Beilan was denied it also. If Schlesinger was entitled to a writ of prohibition against the presiding judge in his case, Beilan should have asked for an injunction against the Philadelphia Board of Public Education in this case.

Of course, it is not my intention here to say any more about the *Roth* and *Schlesinger* cases than I have just said. It is enough to refer to *In Re Grand Jury,* 98 P.L.J., 152; *In re: Schlesinger Contempt,* 99 P.L.J., 247; and *In re: Schlesinger Contempt,* 99 P.L.J., 275.

The Opinion written by Mr. Justice CHIDSEY in this case is an excellent one, and it is regrettable that it had to be marred by the reference, with approval, to the *Roth* and *Schlesinger* cases, supra.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

The issue in this case is *not* whether a Pennsylvania school board may dismiss a teacher for membership in the Communist Party or in any other subversive organization committed to the overthrow of the Government of the United States by force and violence. Of course, it may do so—a statute expressly so authorizes: Pennsylvania Loyalty Act of December 22, 1951, P. L. 1726,

65 PS §211 et seq., commonly referred to as the Pechan Act. See, also, *Albert Appeal,* 372 Pa. 13, 92 A. 2d 663, which was based on a subsequently repealed provision of Section 1122 of the Tenure Act in the Public School Code, as amended by the Act of March 10, 1949, P. L. 30.

The primary question here involved is,—By what legal procedure may a school board competently find the disqualifying factor which warrants the teacher's dismissal? It will hardly be disputed that the answer to that question is that it must be in a proceeding which comports with the requirements of due process. And, the established tenure of a school teacher is a right of which he cannot be deprived, in circumstances reflecting on his loyalty, without due process of law: *Wieman v. Updegraff,* 344 U. S. 183.

The crucial question, then, in this case is whether the respondent, Beilan, was dismissed from his position as a teacher in the public schools of Philadelphia in compliance with the requirements of due process. The importance of that inquiry is not to be gainsaid. Strict adherence to required legal procedures, especially where one's loyalty is being impugned, affords the greatest and, in last analysis, the ultimate assurance of the inviolability of our freedoms as we have heretofore known them in this Country. Least of all, should they be impaired or trenched upon by procedural shortcuts.

The Loyalty Act of 1951, supra, provides in Section 3 that "No subversive person, as defined in this act, . . . shall be eligible for employment in or appointment to any office or any position of trust or profit in the government of or in the administration of the business of this Commonwealth, or of any school district, county, municipality or other political subdivision of this Commonwealth." Section 6 provides that the "appointing authority may . . ., upon written complaint, investi-

gate any person, including teachers and other employes of the public school system, . . . to determine whether he is a subversive person." Section 7 provides that "Any person, including teachers and other employes of the public school system, who has been so notified under this act, shall have a right to a hearing before the proper appointing authority within thirty (30) days after receiving said notification." Section 10 provides for appeal by a teacher to the Superintendent of Public Instruction from a determination made by the Board of Education that he is a subversive. And, Section 12 provides for an appeal to the court of common pleas by a teacher aggrieved by the action of the Superintendent of Public Instruction. Indeed, on the request of the appellant teacher, the hearing in the court of common pleas must be *de novo*. And, of course, there is a right to appellate review of the action of the court of common pleas on broad certiorari in the statutory circumstances obtaining.

With the offense thus proscribed and the procedure for ascertaining its existence in the person of any one, covered by the Act, thus carefully spelled out, why should any one think that a teacher suspected of disloyalty could be dismissed under any other procedure than that prescribed by the Loyalty Act. Does not Section 13 of the Act of March 21, 1806, P. L. 558, 4 Sm. L. 326, §13, 46 PS §156, provide that "in all cases where a remedy is provided or duty enjoined, or anything directed to be done by any act or acts of assembly of this commonwealth, the directions of the said acts shall be strictly pursued, and no penalty shall be inflicted or anything done agreeably to the provisions of the common law, in such cases, further than shall be necessary for carrying such act or acts into effect"? The foregoing provision has been cited and respected by this court many times down to the present: see, e.g., *Jacobs*

*v. Fetzer,* 381 Pa. 262, 265, 112 A. 2d 356 (1955); *Collegeville Borough v. Philadelphia Suburban Water Company,* 377 Pa. 636, 645, 105 A. 2d 722 (1954); *Oteri Appeal,* 372 Pa. 557, 561, 94 A. 2d 772 (1953). As was declared in *Derry Township School District v. Barnett,* 332 Pa. 174, 177, 2 A. 2d 758, with respect to the Act of 1806, supra, "When a statutory remedy has been provided, each step in the proceeding can be taken only as the legislature has prescribed: [citing cases]."

How, then, did the School Board come to disregard the procedure prescribed by the Loyalty Act for investigating and acting upon the case of a teacher suspected of disloyalty? By the simple expedient of professing that the Board's inquisition had nothing whatsoever to do with Beilan's "loyalty or disloyalty". The Board avows that it dismissed him for "incompetency" under the Public School Code for his refusal to answer a question by the Superintendent of Schools on two occasions (June and October, 1952) as to whether he had been press director of the professional section of the Communist Political Association eight years before and for his refusal to answer questions of similar nature by counsel for a subcommittee of the Un-American Activities Committee of the House of Representatives on November 18, 1953. The Committee's interrogations were concerned with Beilan's political and organizational affiliations four to ten years before. In refusing to answer the Un-American Activities Committee's questions, he pleaded the protection of the Fifth Amendment although, in answer to a question as to whether he had ever been a member of the Communist Party, he testified "I am not now a member." He also told the Committee,—"I am willing to talk about myself and about no one else."

On November 24, 1953, the Superintendent of Schools informed Beilan by letter that he was rated

"unsatisfactory" as a result of his refusal to answer questions presented by the Superintendent and by the subcommittee of the Un-American Activities Committee of the House of Representatives. The next day, the Board of Public Education preferred charges against Beilan on the grounds of "incompetency and persistent and wilful violation of the school laws of this Commonwealth". The fact is that Beilan had been a teacher in the public schools of Philadelphia for twenty-three years, his employment in later years being as a teacher in one of the City's high schools. He had tenure under the Pennsylvania Teachers Tenure Act, and for every one of his twenty-three years of teaching he had received a "satisfactory" rating from the proper officer of schools even down to the time of his appearance before the Un-American Activities Committee. Yet, he was dismissed for "incompetency".

The charge of "persistent and wilful violation of the school laws of this Commonwealth" dropped completely out of the case at the hearing before the Board of Education. It had obviously been inserted as a sort of catch-all to cover any dereliction of the teacher that might possibly crop out at the hearing. As counsel for the Board explained it, the "persistent violation" charge depended upon whether "the sum total of the conduct which will be demonstrated constitutes a generalized violation of the School Code under the wilful and persistent violation terms". Apparently not having a single overt act to support the charge (other than Beilan's refusal to answer the Superintendent's one question and those asked by the Un-American Activities Committee), counsel for the Board was forced to abandon the charge. In answer to the question of the President of the Board whether he could point to any section of the law that had been violated, counsel for the Board answered,—"Under the wilful and persistent

violation of the School Code provision, yes, sir, *there is none"* (Emphasis supplied).

That leaves as the basis for the charge of incompetency Beilan's refusal to answer the School Superintendent's one question as to his political affiliation of eight years before (it was not until the Act of December 21, 1951, P. L. 1712, that the Communist Party was denied a place on an election ballot in Pennsylvania where it had appeared at prior times) and his refusal to answer questions of a similar nature by the Un-American Activities Committee on a plea of the protection afforded by the Fifth Amendment. But, the record of Beilan's interrogation by the Un-American Activities Committee, which was received in evidence against him at his hearing before the Board of Education, was entirely incompetent to justify his dismissal as a school teacher. The recent decision of the Supreme Court of the United States in *Slochower v. The Board of Higher Education of New York City,* 350 U. S. 551 (handed down April 9, 1956), holds that a State school teacher having tenure may not be summarily dismissed for pleading the Fifth Amendment in refusing to answer questions of a congressional committee as to his prior political affiliations. There is left, then, as the basis of the finding of Beilan's incompetency only his *refusal to answer the School Superintendent's single question* whether he had been press director of the professional section of the Communist Political Association eight years before.

But, before we come to that! Even assuming, arguendo and quite momentarily, that Beilan's refusal to answer the Superintendent's question justified a finding that he was incompetent within the meaning of that term as used in Section 1122 of the School Code, as amended, his dismissal should at least be reversed and a new hearing awarded because of the patent error per-

meating the Board's determination. There were, as we have seen, two counts in the charges against Beilan before the Board, one of which (viz., his refusal to answer the questions of the Un-American Activities Committee on a plea of the Fifth Amendment) was incompetent, but the Board rendered what was tantamount to a general verdict. It is indeed possible that the Board's determination was based in whole or, at least, in part on the invalid count and, hence, constituted a lack of due process. The situation was well typified in *Kotteakos v. United States*, 328 U. S. 750, 765, where it was said,—"But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error." See, also, *Hisak v. Lehigh Valley Transit Co.*, 360 Pa. 1, 6, 59 A. 2d 900, and cases there cited.

Beilan's refusal to answer the Superintendent's question did not render him incompetent, and no indulgence in semantics can change that fact. The case of *Horosko v. Mt. Pleasant Township School District*, 335 Pa. 369, 6 A. 2d 866, which the majority opinion uses to define the term "incompetency", does nothing of the kind. It consists of a statement of generalities in the negative, covers everything and touches nothing. The fact is that the Superintendent was apparently not disturbed by Beilan's failure to answer his question. He did nothing about it from June, 1952, until November, 1953, a few days after the Un-American Activities Committee visited Philadelphia. Yet, as already stated, during all of that period of time Beilan had been given a "satisfactory" rating right down to the time of his

appearance before the Un-American Activities Committee.

Nor can the term "incompetency", as used in Section 1122 of the School Code, be held to embrace acts of subversion or disloyalty. The legislative history of Section 1122 of the School Code and of the Loyalty Act makes that fact clear as day. Prior to 1949, Section 1122 contained "incompetency" as one of the grounds for a school board's dismissal of a teacher. By Act of March 10, 1949, P. L. 30, the legislature amended Section 1122 by adding thereto as a further ground for the dismissal of a teacher his "advocation of or participating in un-American or subversive doctrines". (Incidentally, it was under that particular amendment that *Albert Appeal*, supra, was decided.) However, in enacting the Loyalty Act of December 22, 1951, which made subversive public employees, including school teachers, subject to dismissal by the appointing authority upon investigation, notice and hearing, the above mentioned 1949 amendment of Section 1122 of the School Code was *specifically* repealed in the following significant language, —"Section 1122 of the act [of March 10, 1949, P. L. 30] . . . and its amendment, is hereby repealed insofar as it authorizes termination of the contract of a professional employe [i.e., a school teacher] for advocating or participating in un-American or subversive doctrines."

The learned court below had not the slightest difficulty in seeing through the gossamer with which the Board obscures the real basis for its dismissal of Beilan. It presumes to say that its action was wholly unrelated to any question of Beilan's loyalty. The court concluded, however, that "the proceedings before the Board of Education were actually concerned solely with the question of [Beilan's] suspected disloyalty." With that conclusion, I thoroughly agree. But, the majority state in the opinion for this court that the lower court's

conclusion in the particular just quoted "impugns the good faith of the members of the Board." Most respectfully, I answer that it does nothing of the kind. There was neither cause nor occasion below, any more than there is here, to impugn the good faith of the members of the Board—a group of highly respected, public spirited citizens gratuitously performing a most important civic service. Yet, it was the duty of the court below, just as it is our duty now, in passing upon this controversy, to view the record objectively and draw our own conclusions therefrom instead of complaisantly accepting the Board's own subjective estimate of its proceeding against Beilan.

The hearing which the Board conducted into Beilan's refusal to answer the Superintendent's one question and the questions of the Un-American Activities Committee was a loyalty proceeding from beginning to end; and it is rather disingenuous for anyone to suggest otherwise. If it was not a loyalty proceeding, it was nothing other than a *brutum fulmen* except for the seriousness of its determination which this court now enthrones as finality. The Superintendent of Schools testified that when Beilan came to his office, pursuant to summons, the Superintendent told him that he had information that bore on the question of Beilan's loyalty and that he wanted to know about it. And, the State Superintendent of Public Instruction, in his opinion dismissing Beilan's appeal from the Board's action, made a formal finding that the local Superintendent had informed Beilan that he "wished to ask him some questions having an important bearing on his loyalty."

One would have to be naive indeed to be able to say truthfully that he did not believe that Beilan's refusal to answer the array of stigmatizing questions asked him by counsel for the Un-American Activities Committee (on counsel's say-so that the Committee had "sworn

testimony" to support the implications of the questions) had not produced in the minds of the Board members an implied confession by Beilan of his guilt. Such was the practical effect of the procedure and made of the Board's hearing an inquiry into Beilan's loyalty—a proceeding possible in Pennsylvania only under the Loyalty Act. In *Slochower v. Board of Education,* supra, Mr. Justice CLARK recognized for the Supreme Court that "In practical effect the questions asked are taken as confessed and made the basis of the discharge." Even here, although the record of the hearing before the Un-American Activities Committee has no proper place in this case and should be disregarded, the majority opinion buttresses its presentation with a detailed repetition of the questions asked by the Committee's counsel and adds that "In each case he refused to answer and relied on the protection of the Fifth Amendment."

The tendency of recent years to treat a plea under the Fifth Amendment against self-accusation as a confession of guilt was condemned by the Supreme Court in *Slochower v. Board of Education,* supra, in the following trenchant language: "At the outset we must condemn the practice of imputing a sinister meaning to the exercise of a person's constitutional right under the Fifth Amendment. The right of an accused person to refuse to testify, which had been in England merely a rule of evidence, was so important to our forefathers that they raised it to the dignity of a constitutional enactment, and it has been recognized as 'one of the most valuable prerogatives of the citizen.' *Brown v. Walker,* 161 U. S. 591, 610. We have reaffirmed our faith in this principle recently in *Quinn v. United States,* 349 U. S. 155. In *Ullmann v. United States,* 350 U. S. 422, decided last month, we scored the assumption that those who claim this privilege are either criminals or perjurers. The privilege against self-incrimination

would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury. As we pointed out in *Ullmann*, a witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing. The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances. See Griswold, The Fifth Amendment Today (1955)."

The right has been recognized in England as an ageless part of that Country's unwritten constitution. A century before the adoption of our Federal Constitution and the establishment of our National Government, the plea was made in the Colony of Pennsylvania on a memorable occasion reported by Dean Griswold in his pamphlet entitled "The Fifth Amendment Today", Harvard University Press, 1955. As there related, in 1689, William Bradford, a young printer who had introduced the art of printing to the middle provinces of America, had printed the Charter of the Provinces so that the people could see their rights. Apparently anticipating some trouble he had not put his name on the pamphlet. He was summoned by the Governor of the Colony who interrogated him as to who had given him license thus to print. He responded "Governour, it is an impracticable thing for any man to accuse himself; thou knows it very well. . . . Let me know my accusers, and I shall know the better how to make my defence." The episode is so highly pregnant with meaning for us today that the colloquy merits printing here in full.[1]

---

[1] *"Governour.*—Why, sir, I would know by what power of authority you thus print? Here is the Charter printed!

*"Bradford.*—It was by Governour Penn's encouragement I came to this Province, and by his license I print.

*"Governour.*—What, sir, had you license to print the Charter? I desire to know from you, whether you did print the Charter or not, and who set you to work?

We have, indeed, come a long way since 1689. But, one may well wonder at times in just what direction so far as respect for the constitutional rights of the individual is concerned. Here is a case of a long-time public school teacher, entitled by statute to tenure, who is deprived of his professional status and livelihood because he pleaded the Fifth Amendment in refusing to answer questions of a congressional committee, touching his loyalty. He has never yet been confronted by his accusers or given an opportunity to cross-examine them. If it be said, by way of a paraphrase of Mr. Justice HOLMES' oft-repeated epigram, that no one has a constitutional right to be a school teacher, still one does not surrender his constitutional rights by becoming a public school teacher.

I would affirm the order of the court below.

---

"*Bradford*.—Governour, it is an impracticable thing for any man to accuse himself; thou knows it very well.

"*Governour*.—Well, I shall not much press you to it, but if you were so ingenuous as to confess, it should go the better with you.

"*Bradford*.—Governour, I desire to know my accusers; I think it very hard to be put upon accusing myself.

"*Governour*.—Can you deny that you printed it? I do know you did print it, and by whose directions, and will prove it, and make you smart for it, too, since you are so stubborn.

"*John Hill*.—I am informed that one hundred and sixty were printed yesterday, and that Jos. Growden saith he gave 20s for his part towards the printing it.

"*Bradford*.—It's nothing to me, what 'Jos. Growden saith.' Let me know my accusers, and I shall know the better how to make my defence."* "* See John William Wallace, *An Address Delivered at the Celebration by the New York Historical Society, May 20, 1863, of the Two Hundredth Birthday of Mr. William Bradford.* Albany, 1863, pp. 49-52."

DISSENTING OPINION BY MR. JUSTICE BELL:

It is with great regret that I feel compelled to dissent from the majority opinion which has reached such a desirable conclusion.

Beilan, a teacher of English at the Simon Gratz High School, Philadelphia, was dismissed on the ground of "incompetency" and "of persistent and willful violation of the school laws" which are grounds for dismissal *under The Teachers' Tenure Act* of May 18, 1911, P. L. 309, as amended by Act of June 20, 1939, P. L. 482. The Superintendent of Public Instruction of the Commonwealth of Pennsylvania affirmed the dismissal; the lower Court, in a very able opinion, reversed the dismissal, and set aside the discharge of Beilan.

This Court is asked to reverse the Court below and to justify Beilan's dismissal *solely* on the ground of "incompetency". Appellant admits that if the word "incompetency" as used in said Act is restricted to a narrow interpretation, i.e., educational background and technical ability to teach the subject, Beilan was not incompetent. However, appellant correctly contends that the word "incompetency" as used in the Tenure Act has a much broader meaning (see, inter alia, *Horosko v. Mt. Pleasant Township School District*, 335 Pa. 369, 6 A. 2d 866) ; and further contends—and this is the real issue—that it includes (1) any present but unproved association with the Communist Party, and (2) failure to answer questions—under the privilege of the Fifth Amendment—concerning past associations with the Communist Party. Appellant admits in its brief that Beilan was discharged solely because he refused to answer questions concerning his past subversive affiliations. We cannot shut our eyes to the inescapable fact which we are convinced—notwithstanding the earnest, able argument of counsel for the Board— is glaringly disclosed by this Record, that Beilan was

fired because the Board believed that he was a Communist.

The teaching profession apparently believes, under the theory or doctrine of Academic Freedom, that a teacher has a constitutional right to think as he pleases, believe as he pleases, speak and teach and *do* as he pleases. Everyone in the United States has the right to think and believe whatever he wishes. However, Freedom of Speech, which is guaranteed by the Constitution of the United States and the Constitution of Pennsylvania, is neither absolute nor unlimited: *Dennis v. United States,* 341 U. S. 494 (1950) ; *Gitlow v. People of New York,* 268 U. S. 652; *Wortex Mills, Inc. v. Textile Workers Union,* 369 Pa. 359, 85 A. 2d 851. Moreover a citizen has no absolute and unqualified constitutional right to be a policeman (*Souder v. Philadelphia,* 305 Pa. 1, 156 A. 245; *McAuliffe v. Mayor,* 155 Mass. 216, per Mr. Justice HOLMES), or to be a teacher, or to teach or conduct himself in a manner which is validly prohibited. For example, a State or City can validly and constitutionally require its teachers and other employes to disclose under oath their past and present membership in the Communist Party or their past and present Communist political associations; and a municipal ordinance requiring municipal employes to take oath that they had not, during five preceding years, advocated or *knowingly* belonged to an organization advocating overthrow of our government by force and violence is constitutional: *Garner et al. v. Board of Public Works of Los Angeles,* 341 U. S. 716; *Adler v. Board of Education of City of New York,* 342 U. S. 485; *Albert Appeal,* 372 Pa. 13, 92 A. 2d 663; Cf. also, *Wieman v. Updegraff,* 344 U. S. 183. In the *Adler* case the Court said, inter alia (page 492) :

" '. . . Past conduct may well relate to present fitness; past loyalty may have a reasonable relationship

to present and future trust. Both are commonly inquired into in determining fitness for both high and low positions in private industry and are not less relevant in public employment.' 341 U. S., at page 720.

"We adhere to that case [Garner v. Board, 341 U. S., supra]. A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted. One's associates, past and present, as well as one's conduct, may properly be considered in determining fitness and loyalty. From time immemorial, one's reputation has been determined in part by the company he keeps. In the employment of officials and teachers of the school system, the state may very properly inquire into the company they keep, and we know of no rule, constitutional or otherwise, that prevents the state, when determining the fitness and loyalty of such persons, from considering the organizations and persons with whom they associate."

In *Albert Appeal*, 372 Pa., supra, this Court, speaking through Chief Justice STERN, wisely said (page 19) : "In short, it is essential, in order to protect our children from treacherous influences, that persons who advocate or participate in subversive doctrines should not be employed, or if employed should not be retained, as teachers in our public schools, and any teacher dismissed for such a reason cannot properly claim that any constitutional or legal right is thereby violated."

It is clear, therefore, that the Legislature or municipality or school district has a right to impose reasonable provisions and reasonable limitations upon those

desiring to teach in a public school. It is likewise clear that the questions propounded to Beilan by Dr. Hoyer, Superintendent of Philadelphia Public Schools, as to his past Communistic associations were relevant and proper, although Beilan's *refusal to answer* questions of the Un-American Activities Committee (of the House of Representatives) as to his past Communistic activities and associations, was apparently (a) insufficient to justify his dismissal as a teacher and (b) irrelevant in this proceeding: *Slochower v. Board of Education* (New York), 350 U. S. 551 (1956). It is not necessary to decide whether *past* Communistic activities and associations,—which Beilan, in the eyes of the community, although not in law[1] admitted by refusing to answer questions pertaining thereto,—would be sufficient of

---

[1] See majority and dissenting opinions in *Slochower v. Board of Education* (New York) 350 U.S., supra. In that case Mr. Justice REED, with whom Mr. Justice BURTON and Mr. Justice MINTON joined, said in his dissenting opinion: "The fact that the witness has a right to plead the privilege against self-incrimination protects him against prosecution but not against the loss of his job."

In *Brown v. Walker*, 161 U. S. 591 (1896), the Supreme Court of the United States at pp. 605-606 stated: "The design of the constitutional privilege is not to aid the witness in vindicating his character, but to protect him against being compelled to furnish evidence to convict him of a criminal charge. If he secures legal immunity from prosecution, the possible impairment of his good name is a penalty which it is reasonable he should be compelled to pay for the common good."

In *United States v. Mammoth Oil Co.*, 14 F. 2d 705 (CCA 8th 1926), affirmed 275 U.S. 13 (1927) there was a civil action by the United States for the cancellation of oil leases on the ground of a bribe to a high government official. One of the witnesses for the defendant oil company, a son-in-law of the guilty cabinet officer, invoked the Fifth Amendment. In the trial of the issue of fraud, the trial Judge ruled that no inference of fraud against defendant could be drawn from the refusal of the witness to testify on the plea of self-incrimination. The Court of Appeals in reversing the judgment of the District Court, held in an opinion by Judge KENYON,

themselves to justify dismissal if he had sincerely repented and is no longer a Communist, or participating in un-American activities or advocating subversive doctrines.

We are apt to forget that from 1933 when the President of the United States recognized Communist Russia, until the middle or late 1940's many of the highest political leaders of our Federal Government, many persons who were connected with the State Department, many members of labor unions, many Judges, and the so-called liberals, were strongly pro-Communist. The real nature[2] as well as the terrible menace and dangers of atheistic Communism were not comprehended by these people, who gullibly treated and portrayed Communists as genuine democrats or, in the case of China, as agrarian reformers. Moreover, the Communist

at page 729 : "Why is silence the answer of a former cabinet official to the charge of corruption? Why is silence the only reply of Sinclair, a man of large business affairs, to the charge of bribing an official of his government? Why is the plea of self-incrimination—one not resorted to by honest men—the refuge of Fall's son-in-law, Everhart? . . . Men with honest motives and purposes do not remain silent when their honor is assailed. . . . Is a court compelled to close its eyes to these circumstances? . . . These gentlemen have the right to remain silent, to evade, to refuse to furnish information, and thus to defy the government to prove its case; but a court of equity has the right to draw reasonable and proper inferences from all the circumstances in the case, and especially from the silence of Secretary Fall and from the failure of Sinclair to testify."

[2] Communism is a world-wide revolutionary movement to overthrow, by force, violence or sabotage, the government of every nation and to establish a Communist dictatorship therein. Having formed an organization to combat Communism as early as 1935, I know something about it and the actions of those who were deluded by the professed objectives of Stalin and his fellow travelers viz. a government of, by and for the proletariat with peace and prosperity. Even today the menace of Communism is not fully appreciated by many influential Americans.

Party was recognized as a political party in Pennsylvania until it was outlawed and abolished by the Act of December 21, 1951, P. L. 1712.

That brings us to the main question here involved: What are the grounds and the procedure which the Legislature has prescribed for the removal of a teacher, and more particularly: Did Beilan's conduct amount to "incompetency" for which he could be discharged under of Teachers' Tenure Act.

The teaching profession, in order to secure tenure and "to preserve the system of employment in the educational field free from any [arbitrary or political] interference" (*Teachers' Tenure Act Cases*, 329 Pa. 213, 222, 197 A. 344), induced the Legislature to pass The Teachers Tenure Act.[3] The Tenure Act placed specific and "emphatic limitations" on the removal of teachers. The Tenure Act provided—*prior to March 1949*—that a teacher's contract of employment could be terminated on any one—and impliedly and necessarily on only one or more—of the following seven grounds: "Immorality, *incompetency*, intemperance, cruelty, persistent neglect, mental derangement, and persistent and willful violation of the school laws of this Commonwealth". The Act conspicuously failed to mention as a ground for dismissal, Communism or un-American or subversive activities or doctrines; and nowhere is the Board authorized to dismiss a teacher for exercising his Constitutional privilege of refusing to answer incriminating questions about his past Communistic activities or associations.

On March 10, *1949*, the Teachers' Tenure Act was amended to include as an *additional* cause for dismissal *"advocation of or participation in un-American or sub-*

---

[3] Act of May 18, 1911, P. L. 309, §1205, as amended by Act of June 20, 1939, P. L. 482, §2.

*versive doctrines".* That would clearly indicate that in the mind of the Legislature (a) "incompetency" did not, prior to 1949, include "advocation of or participation in un-American or subversive doctrines", and (b) that said amendment of 1949 was necessary if a teacher was to be discharged on those grounds. *If that were not so, there would have been no reason or necessity for the 1949 amendment.*

But the Legislature went further. The Legislature passed the Act of December 22, *1951,* P. L. 1726, 65 PS §211, popularly called the Pechan Act, but more accurately known as the Pennsylvania Loyalty Act, the constitutionality of which was sustained in *Fitzgerald v. Philadelphia,* 376 Pa. 379, 102 A. 2d 887. That important patriotic Act prescribes in §217 the procedure, as well as the substantive law, governing the removal of a disloyal or subversive teacher: ". . . If, after due hearing, it is determined by the appointing authority *by a fair preponderance of the evidence* that the person who has been so notified is a subversive person, as defined in this act, the person who has been so notified shall be discharged." For reasons best known to the Legislature, the Loyalty Act specifically and unwisely *repealed* the *1949* amendment of the Teachers' Tenure Act, which as we have seen had authorized dismissal of a teacher for "advocation of or participating in un-American or subversive doctrines." It is clear therefore that the Legislature intended (a) that a subversive teacher could be discharged only under the Loyalty Act, and (b) indicated (for the second time) that the word "incompetency" in the Tenure Act was not intended to include "advocation of or participating in un-American or subversive doctrines".

Our conclusion is fortified and buttressed, though it is not necessary to do so, by the further fact that Senator Pechan, the author of the Loyalty Act of 1951,

introduced in the 1953 Session of the Legislature, Senate Bill No. 94, and in the 1955 Session, Senate Bill No. 22, each of which provided for the removal of public servants who refused to testify on Constitutional grounds, viz., under the privilege of the Fifth Amendment—and the Legislature refused to pass the Bills. It seems to me evident that the Legislature of Pennsylvania has clearly provided that a person can be dismissed as a teacher for un-American activities or advocation of subversive doctrines only when the charge is made under the Loyalty Act and the appointing authority proves such charges, not by defendant's refusal to testify, but by a fair preponderance of the evidence.

The foregoing reasons make evident why I must regretfully dissent from the majority opinion.