## Kaplan, Appellant, *v.* Philadelphia School District.

Argued November 27, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

214

*Henry W. Sawyer, III,* with him *Drinker, Biddle & Reath,* for appellant.

*C. Brewster Rhoads,* with him *Edward B. Soken* and *Sidney L. Wickenhaver,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 25, 1957:

On July 12, 1948, Samuel M. Kaplan, the plaintiff in this case, entered into a contract with the School District of Pennsylvania, the defendant, to teach English in the public schools of Philadelphia on a salary basis. So far as the record shows, he demonstrated himself to be a competent teacher in his field, but it was reported to the Superintendent of Philadelphia Schools that while Kaplan was instructing the children in his classes how to express themselves in English he was devoting time to an organization which, if successful in its plans, would eventually have those children or their children's children speaking Russian in a Russian state. The organization was the Communist Party of Eastern Pennsylvania and Delaware, an

integral part of the Communist Party of the United States, a branch of the international Communist conspiracy committed to world revolution in overturning democratic government and installing in its stead the so-called dictatorship of the proletariat.

On October 21, 1952, the Superintendent, Dr. Louis F. Hoyer, asked Samuel Kaplan if he was or had been an organizer of Section 12 of the Communist Party of Eastern Pennsylvania and Delaware. Kaplan replied: "I can't discuss that with you." The question was repeated several times and to each inquiry Kaplan parroted the same answer. On November 19, 1952, Kaplan was again summoned to the Superintendent's office and once more questioned on the subject which had been the subject of their exchange a year before. Kaplan continued to refuse to enlighten the Superintendent in the matter, adding that he was acting under advice of counsel. In the meantime Kaplan had been called before a Congressional investigating committee where he declined to respond to questions put to him in the field of subversive activities. This persistent taciturnity on the part of Kaplan culminated in his suspension from duty on November 20, 1953, when he was informed that recommendation was being made to the Board of Education for his dismissal. A formal hearing followed, and, on January 7, 1954, the Board of Education permanently separated him from his teacher's position. He appealed to the State Superintendent of Public Instruction who affirmed the dismissal and he then appealed to the Court of Common Pleas. The issue raised in that appeal is not before us.

On February 4, 1954, the plaintiff Kaplan filed a complaint in assumpsit against the School District of Philadelphia, averring that he was entitled to his salary from November 20, 1953, the date of suspension,

to January 7, 1954, the date of dismissal. The defendant denied liability, and the plaintiff moved for judgment on the pleadings. The Court below granted the motion and entered judgment in the amount of $914.74. The School District appealed to the Superior Court which reversed the judgment, and, on petition for allocatur, we allowed appeal to this Court. The importance of the question raised here, involving as it does an interpretation of the School Code, takes on additional significance in view of the fact that the claims of 30 other teachers, who were dismissed under circumstances similar to those which obtained in Kaplan's case, will be decided by this "test" case.

The appellant, Samuel Kaplan, maintains that the Board of Education had no authority to suspend him, because Section 1124 of the Public School Code of 1949 (Act of March 10, 1949, P. L. 30, 24 P.S. 11-1124 et seq.) enumerates causes for suspension and his case does not come within any of them. In entering judgment for the appellant, the lower Court said: "Under the code suspension is permissible 'only when there is (1) substantial decrease in pupil enrollment, (2) curtailment or alteration of the educational program, or (3) consolidation of schools, which makes it unnecessary to retain all of the professional employees. Act of 1949, supra, §1124, 24 PS 11-1124.' "

But Section 1124 does not contain the limiting adverb of "only." Nor does the Act in any way limit the authority of the School Board to suspend for cause. It would be most extraordinary if it did. The lower Court cites the case of *Intille v. Hoyer*, 88 D. & C. 512. In that very case, Court of Common Pleas No. 5 of Philadelphia County, in rejecting the argument which is also being made by the appellant in this case, said: "But the act does not lend itself to the tortured construction advanced by plaintiff. Because a teacher

passes certain qualifying grades, she is not automatically so secure in her position that if she commits some act detrimental to society or to the children placed in her charge, the superintendent of schools is powerless to dismiss the teacher pending a final hearing by the board of education. The act contains as a matter of course certain implied powers to control the activities of a member of the teaching staff in or out of the school itself."

It must be as obvious as print can make it that Section 1124 of the School Code has absolutely no relevancy whatsoever to the circle of controversy of which the plaintiff here is the center. Section 1124 is confined to pedagogical overstaffing in schools, which of course is as far removed from the situation in this case as Budapest is from Leningrad. The suspension contemplated in Section 1124 is in the nature of an impermanent separation, it is in reality simply a furlough, it is a laying-off, it is a temporary discontinuance until conditions readjust. Suspension under Section 1124 envisages a re-hiring. The suspended teacher is released with no stigma, dishonor, or discredit. He is sent home with regret and with the anticipation of an early return.

But the Kaplan suspension is so utterly something else that comparison with Section 1124 is almost embarrassing. The suspension here involves incompetency, unfitness, and a disregard of the responsibility the plaintiff owed to his profession and the school system. Kaplan's suspension has nothing to do with overstaffing of teachers, curtailment of educational program, or consolidation of schools. Kaplan's suspension was one for *cause,* a cause which he, and he alone, created. Kaplan was suspended because of his refusal to cooperate with the school authorities, an offense which can only be productive of harm, disorganization,

and chaos in any highly efficient enterprise employing multiple persons.

As we have seen, the teacher suspended under Section 1124 is expected to return, but the suspension predicated on unfitness is a one-way ticket. It is the prelude to permanent separation from service. It is a notice of dismissal proceedings. Furthermore, under Section 1124 the suspended employee still remains aboard the ship of professional status, but where unfitness is proved the employee is taken off the ship entirely.

The plaintiff maintains that the school authorities had no right to take him off the ship, arguing that the only force available to put him ashore lies under Section 1124 which concededly gives no such power under the facts of this case. But the plaintiff's argument runs fallacy from every porthole. It overlooks entirely the employer-employee relationship which exists between the school district and the plaintiff. The contract which he signed with the school district on July 12, 1948, assured him a salary provided he worked. It did not guarantee compensation if he was idle as the result of a situation which he voluntarily brought about. The law of contracts is as constant as the law of gravitation. No one is entitled to anything from anybody without consideration. One may obtain gratuities, he may be favored with special attention, but when he goes to law to collect money he must prove that he gave something for that money or that he forewent some advantage which enured to the benefit of the person from whom he claims money.

The plaintiff not only did not work for the period between November 30, 1953 and January 7, 1954. A substitute was employed in his place. There is no authority under the School Code which permits payment to two persons for one position when the employment

.of the substitute was made necessary because of the misbehavior of the original employee.

The question as to whether a suspended teacher is entitled to salary for the period between suspension and dismissal was considered in a California case, which we cite with approval. (*Gentner v. Board of Education of Los Angeles*, 219 Cal. 135.) There, as here, the teacher argued that under the teacher's tenure law he could not be deprived of his salary until the final date of dismissal, even though he did not teach between suspension and dismissal. The Supreme Court of California held: "But in our view it is not an incident of such tenure that a teacher must be given active employment pending the conclusion of dismissal proceeding against him, or paid his full salary when it is determined upon hearing held that cause for removal existed . . . *The welfare of the children is the paramount consideration.* It follows from the fact that the authorities are not required to give active employment to a teacher pending his removal hearing, that, when his removal is subsequently ordered, he is not entitled to receive salary for the period during which he has not taught. The law does not contemplate that public funds shall be expended where no services are performed, and where not only is there no duty to accept services tendered, but the welfare of the children may require that they be dispensed with until a hearing can be held." (Emphasis supplied)

The Superintendent of Philadelphia Schools had not only the right but the duty to ask himself whether or not the welfare of the children in Kaplan's classes would suffer from his continuing tutorship. When the Superintendent conscientiously answered that question in the affirmative he had no course open but to suspend Kaplan.

Of course, the plaintiff maintains that he was ready, able, and willing to work, and that it was not he who walked away from the school but that it was the Board of Education which closed the schoolhouse to him. In this respect the plaintiff devotes a great deal of argument to a proposition that no one disputes, namely, that the Superintendent of Schools may not suspend employees arbitrarily. The Superintendent did not suspend arbitrarily. He suspended because, according to his official cognizance, the plaintiff had become unfit and could become an influence inimical to the best welfare of the children. In the case of *Walker v. Scranton School District,* 338 Pa. 104, 109, this Court said: "The aim and object of our school system is to provide the best education for the children of the Commonwealth. It cannot be doubted that it was the intention of the Legislature to subordinate all other considerations."

Anyone whose conduct is opposed to the aim and object of our school system in providing the best education for the children of the Commonwealth cannot possibly expect to remain employed as their teacher. Certainly, if it were established that a teacher had burned school books or had attempted to set fire to the schoolhouse itself, it could not be argued that he was immune from immediate suspension. Suppose it came to light that a teacher sold narcotics, could it be maintained with any semblance of reason and conscience that the school officials would have no authority to suspend him because Section 1124 of the School Code does not provide for suspension of dope peddlers?

The lower Court which granted judgment in favor of the plaintiff conceded that a teacher might so conduct himself that the authorities would be compelled to suspend him: "It would seem to be obvious that a

teacher may be suspended from the performance of any duties under certain circumstances pending a hearing on charges of dismissal, as was held in Intille v. Hoyer, supra. Certainly if by reason of some immoral action or some definite indication of mental illness, it would be unsafe or improper to have the teacher conduct classes or dangerous to his pupils that he should do so, the superintendent would be remiss if he did not remove him from the classes." But after stating this very sound proposition the Court proceeded to a very unsound conclusion. After building an edifice of logic from cellar to garret, the Court roofed it with a *non sequitur,* namely, "But until the teacher has had the hearing provided for in the code, and there is a proper determination to dismiss him, his pay cannot be cut off." This is to say that an employee may be removed from his position but that he may not be separated from his pay envelope.

But it is to be noted that the very hearing which the Court refers to has already taken place. In fact the Court acknowledged as much in its Opinion: "The code provides specifically for certain procedure, including notice and hearing before the Board, as a preliminary to dismissal. *This procedure was taken here and plaintiff was dismissed on January 7, 1954.*" (Emphasis supplied)

If the reasoning employed by the lower Court were translated into a syllogism, it might come to a rather startling conclusion: Major Premise: A teacher who is morally or mentally unfit has no right to teach. Minor Premise: The Superintendent under those circumstances has the right to remove him. Conclusion: Therefore, the teacher should receive pay for the services he does not and cannot render.

But the appellant goes even further than the lower Court. He argues that the School Code specifically

provides that an employee must be paid during the period he is under suspension. In his brief, after outlining the procedure required by the Code in order to effectuate the dismissal of a teacher, he says: "This latter section (§1130) also provides that where the final decision is in favor of the professional employe that the charges shall be officially expunged from the records of the Board. The section concludes with the following sentence: 'In all such cases there shall be no abatement of salary or compensation.' . . . This sentence prevents the termination of salary even if done with the idea that it would be reimbursed if the charges were to fail. The requirement that there be no *abatement* is a requirement that salary be continued until dismissal. . . The section does not provide that there be a *reimbursement* if there is no dismissal; it says there shall be *no abatement of salary*." (Italics in brief).

But the appellant quoted only the last sentence of Section 1130. By omitting the first part of that section, a concept entirely different from what the Legislature intended and wrote was created. The whole section reads as follows: "In all cases where *the final decision is in favor of the professional employe,* the charges made shall be physically expunged from the records of the board of school directors but, a complete official transcript of the records of the hearing shall be delivered to the one against whom the charges were made. In all such cases there shall be no abatement of salary or compensation." (Emphasis supplied.) From this whole section, it is as clear as a first grade primer, that there shall be "no abatement of salary" *only* where the final decision *"is in favor of the professional employe,"* which of course is not true in Kaplan's case.

In pointing out that the Superintendent of Schools was entirely justified in suspending Kaplan, the Supe-

rior Court, in an able Opinion written by Judge WOODSIDE, said: "The term 'education' includes cultivation of morality as well as attainment of knowledge and intellectual culture."

Further: "The children must be protected from the influence of an immoral or unfit teacher, and the inherent right to remove such teacher from the classroom forthwith, pending dismissal by the board, has not been denied by the teacher's tenure law."

The appellant, in his brief before this Court, takes issue with Judge WOODSIDE's statement just quoted, and argues: "The discussion in the opinion of the Superior Court as to the need to protect children from the influence of an immoral or unfit teacher and 'the inherent right to remove such teacher from the classroom forthwith,' is therefore beside the point." It is not beside the point. It is, in fact, the whole crux of the case. The competency of a teacher does not depend alone upon academic equipment. With technical qualifications for the position must also go character, moral fiber, loyalty to the freedom-loving institutions of the land, and respect for the glorious traditions of the teaching profession. Without these attributes, a teacher is but a speaking blackboard or a walking textbook. A teacher must not only teach, he must inspire the boys and girls who look to him, in addition to classroom instruction, for moral and inspirational guidance.

The Superintendent of Schools has the same right to suspend any teacher whose conduct may deleteriously influence school children as a hospital superintendent has the inherent right to suspend any employee whose conduct may adversely affect the recovery of a sick patient. It was Superintendent Hoyer's duty to investigate the serious reports he had received on Samuel Kaplan. Accordingly, he asked Kaplan if it was true that he had been an organizer of the Communist Party.

From the whole encyclopedia of exculpation, the plaintiff was free to choose any answer he believed fitted the facts, to wit, that he was not nor had never been an organizer of the Communist Party, that he was not an organizer or member of the Communist Party, that he had once been a member of the Communist Party but was not one now, that he did not believe in its ideology, that he had been duped into membership, etc., etc. From all the answers which would have cleared his name and removed the ugly insinuation of disloyalty, or set out the facts as they were, he chose to remain silent. He preferred that the world go on accusing him, even if unfairly (and he knew if the accusation was unfair or not) of having once been faithless to the Constitution of the United States; he preferred to remain in the shadows of disrepute rather than that, with a few words, he should clear the atmosphere of suspicion and doubt. This was a prerogative he was entitled to indulge, but with its exercise went the price which inevitably accompanies silence in the face of so grave a charge.

Could the Superintendent of Schools, with the responsibility he owes the school children and their parents, permit on his teaching staff a member of the Communist Party, or, what amounts to the same thing (where school children are in the picture) a person who refused to deny the Communist Party activity with which he stood accused? Suppose the Superintendent had asked Kaplan if he belonged to a gang of armed robbers which had been holding up banks in the community, and suppose that Kaplan had refused to answer? It is inconceivable that a person so accused of banditry would be allowed to mingle with young children who have been taught to look up at him as a model in morals and comportment. Is it not as equally unthinkable that a person accused of being a

member of a band of international criminal conspiracy should be allowed to impart instruction to the future citizens of our land?

No well-informed person in America is any longer in doubt as to the plotting, purposes, plans, and deeds of the Communist international conspiracy. It has already conquered one-fourth of the earth's land surface and imposed tyrannical domination over one-third of the world's population; it has condemned to slave camps and slave mines millions who have dared to speak or act for freedom; it has, through starvation campaigns, liquidation squads, Siberian exile, and other methods of torture killed off millions who have opposed the dictatorship of the proletariat; it is constantly interfering in the internal affairs of other countries, visiting upon innocent populations death, destitution, and untold misery; it is constantly abusing nations and personages devoted to the cause of world peace; although its master and leading exponent is a member of the United Nations, which is dedicated to the cause of eliminating wars, it has encouraged and fomented wars in Korea, Vietnam, and other areas, with resulting loss and mutilation of life and limb and destruction of cities, homes, and property; it is constantly threatening to upset every safeguard of international amity and to plunge the world into the catastrophe of a third world war which could well bring about the complete destruction of the human race; it scoffs at religion, persecutes clergymen, and offers blasphemy to the Supreme Being which governs all. It is because of this evil force which is loose in the world that America, a peace-loving nation, must be on guard at all times against attack; that it must call to arms a goodly percentage of its youth who otherwise would be preparing for a peaceful career; that it must expend the largest part of its income in the manufacture of

weapons, ammunition, and equipment for defense. It is because of the Communist menace to world order that worry rocks the cradle and the heart is filled with foreboding as to the future. It is because of the threatening Soviet clouds which hover over the world that the resources of America are being depleted and the American people are being burdened with a tax rate never known heretofore.

All this is common knowledge and appears in the adjudications of our Courts, in statutes passed by Federal and State legislatures, in reports of Congressional committees, in the daily newspapers, in periodicals, and on radio and television. No educated person, much less a school teacher, can plead ignorance to these universally recognized facts. When a school teacher refuses to answer, upon being asked by his superior, whether he forms part of this organization which is committed to catastrophe and destruction of all that in the Western world is accepted as good, decent, just, and conducive to wholesome happiness, this is evidence, as stated in the formal charges against Samuel M. Kaplan of "a lack of professional fitness" and lack of responsibility to the teacher's profession and to the school system; and such refusal to answer "constitutes a wilful violation of the school laws of this Commonwealth."

With regard to the purposes of the Communist Party, it is enough to quote from the excellent Opinion by Chief Justice HORACE STERN in the case of *Albert Appeal*, 372 Pa. 13, 20, where he said: "That the Communist Party advocates the use of violence to overturn the governments of non-Communist countries, and especially that of the United States, has been proclaimed in legislative statutes, and can fairly be said to be a matter of general notoriety. . . For example, in our own Commonwealth, the Act of December 21, 1951,

P.L. 1712 proclaims that 'Upon evidence which has been presented and proof which has already been established before the Congress of the United States, the federal courts of the United States, the courts of the Commonwealth of Pennsylvania, and the General Assembly of the Commonwealth of Pennsylvania, there exists an international revolutionary Communist conspiracy which is committed to the overthrow by force and violence of the government of the United States and of the several states, such conspiracy including the Communist Party of the United States, its local components in Pennsylvania, and the members thereof."

Our Courts have held that where a teacher is physically unable to perform his duties he may not receive pay for the period of his incapacitation. (*Hetkowski v. Dickson City Borough School District*, 141 Pa. Superior Ct. 526; *Com. ex rel. Wesenberg v. Bethlehem School District*, 148 Pa. Superior Ct. 250.)

Judge WOODSIDE, in his Opinion of the Superior Court in this case, cogently commented on the inconsistency of depriving a teacher of his wages if he breaks his leg but of paying a teacher who fractures the moral code: "When a teacher breaks his leg he becomes physically unfit to perform his duties, and when he breaks the moral laws he becomes morally unfit to perform his duties. To deny compensation to the teacher who suffers a physical or mental handicap which makes him unfit to teach, and allow compensation to the teacher who deliberately breaks the moral law which makes him unfit to teach, would result in an absurd and unreasonable interpretation of the act. The legislature does not intend such an interpretation of its acts."

In his argument before the Superior Court the appellant asserted that denying him compensation for the period he was not allowed to teach, although ready

and willing, was unfair since he could not have had any harmful influence on the students, no charges of improper teaching or classroom misconduct having been filed against him. We subscribe to the Superior Court's observation on that argument: "The influence of a teacher upon his pupils is not limited to what he says and does in the schoolroom. As a minister's conduct outside of the church is a matter of concern to his parishioners so is the conduct of a teacher outside of the schoolroom a matter of concern to the school authorities. Children frequently attempt to emulate their teachers and their every known act frequently becomes a matter of importance to the student. Although a teacher's conduct outside of the classroom is probably less important in urban districts than in rural districts and in high school than in grammar school, nevertheless the teacher's right to teach cannot depend solely upon his conduct in the schoolroom."

Chief Justice STERN also stated the matter excellently in *Albert Appeal,* supra: "Children respect and look for guidance to their school teachers second only to their parents; their immature minds are influenced not only by what they are actually taught in the classroom but also by the personality of their teacher; the impressions they receive in school are bound to color their adult lives and to determine for them, as they advance into manhood and womanhood, whether they emerge as patriotic or as unfaithful citizens. In short, it is essential, in order to protect our children from treacherous influences, that persons who advocate or participate in subversive doctrines should not be employed, or if employed should not be retained, as teachers in our public schools, and any teacher dismissed for such a reason cannot properly claim that any constitutional or legal right is thereby violated."

Judgment affirmed.

Mr. Justice CHIDSEY concurs in the result.

Mr. Chief Justice HORACE STERN took no part in the consideration or decision of this case.

———

DISSENTING OPINION BY MR. CHIEF JUSTICE JONES:

I would reverse the judgment of the Superior Court and reinstate the Common Pleas Court's award to the plaintiff of the unpaid salary under his teaching contract with the defendant School District for the period (approximately seven weeks) between his suspension by the Superintendent of Schools and his dismissal by the Board of Public Education.

The question of law involved is a very simple one and, no doubt, would have been simply answered were it not for the fact that the real issue in the case has become submerged, on appellate review, in an imputation that the plaintiff was tainted with past Communist affiliations. Not only was he not charged by the Board with having been a Communist or a Communist sympathizer but, throughout the proceedings against him, the Board of Public Education has been at special pains to make it plain that he was neither suspended nor dismissed because of any alleged Communist association or sympathy. That was made unmistakably clear in *Board of Public Education v. Beilan,* 386 Pa. 82, 86-87, 125 A. 2d 327 (now pending in the Supreme Court of the United States on petition for certiorari), in language no less applicable to this case. What disposition the Supreme Court may make of the petition for certiorari in the *Beilan* case will have no bearing whatsoever on the question here involved. Kaplan, the present plaintiff, seeks to recover the unpaid salary under his teaching contract from the time of his suspension by the Superintendent of Schools up to his

dismissal by the Board of Public Education while Beilan questioned the legality of his dismissal. Both cases grew out of precisely similar circumstances and as a result of the same seriatim set of School Board hearings. So that, what was avowed in this court as the motivating reasons for Beilan's dismissal by the Board of Public Education is equally pertinent to Kaplan's suspension by the Superintendent of Schools on the question of the ground for the action. In its brief in the *Beilan* case, the Board of Public Education emphasized that Beilan "was *not* dismissed for subversion, either past or present. The Board does *not* contend that subversion is to be equated with incompetency. It does *not* assert that subversion, past or present, is ground for dismissal under the Tenure Act. The question of subversion is not before this Court. The Board does not contend that the appellee is subversive, or that he can be or has been proved subversive by his refusal to answer the questions either of the Superintendent or the Congressional Committee."

As indicated, Kaplan does not here challenge his dismissal by the Board of Public Education. That question is still pending in the Court of Common Pleas of Philadelphia County on his timely appeal from his dismissal which awaits, for its ultimate disposition, the final outcome of the *Beilan* case, supra. There need be, therefore, no misconception with respect to the scope of the legal issue here involved. The defendant School District is not at any misunderstanding concerning the matter for decision. In its brief it expressly recognizes that "The only question here is whether the Board is obligated to pay such employee his salary during the period between his suspension and his ultimate dismissal."

The facts giving rise to the controversy are as follows. The plaintiff entered into a written teaching

contract with the School District of Philadelphia on July 13, 1948, which date forthwith became the time of his permanent appointment. The contract was on the form prescribed and required by Section 1121 of the Public School Code of 1949.[1] The contract, by its terms, was expressly made subject to the Public School Code and was to continue in force year after year unless terminated by the voluntary resignation of the professional employee (i.e., the contracting teacher) or by the Board of Public Education in accordance with the provisions of the Public School Code. On November 20, 1953 (incidentally, shortly after Kaplan had plead the Fifth Amendment's protection against self-accusation upon refusing to answer questions, touching his loyalty, propounded by counsel for the Un-American Activities Committee of the House of Representatives), the Superintendent of Schools suspended him from his teaching duties and recommended to the Board of Public Education that he be dismissed from his position as a teacher. On two occasions more than a year before his suspension he had declined to answer similar questions asked him by the Superintendent of Schools, but the latter had not taken any action against him for such refusal. Actually, in the interim, he had been officially given a satisfactory rating as a teacher down to the very day of his suspension.

As a result of the Superintendent's action, the Board, by formal resolution, preferred against Kaplan charges of incompetency and persistent and willful violation of the school laws of the Commonwealth, citing as the basis for the charges his refusal to answer the questions of the Superintendent and of the Congressional Committee concerning his alleged Communist

---

[1] Act of March 10, 1949, P. L. 30, 24 PS §11-101 et seq.

affiliations some few years before. The Board served Kaplan with notice of the charges and fixed a time for a hearing thereon as required by the Public School Code. Kaplan attended the hearing where he testified and was represented by counsel. Following the hearing, the Board, on January 7, 1954, found the charges against him to have been sustained by the evidence and, thereupon, dismissed him from his position as a teacher.

The Public School Code of 1949 alone supplies the authority of a school board or a school superintendent in respect of a teacher; and it vests solely and exclusively in the *school board* the power to dismiss a teacher and to terminate his professional contract: Sections 1126-1130. It is veritably a legal maxim in this State that the provisions of the Teachers' Tenure Act, as embodied in the Code, must be strictly complied with in respect of the suspension[2] or dismissal[3] of a professional employee if actions to such ends are to be accorded judicial sanction. Thus, in *Jacobs v. Wilkes-Barre Township School District*, 355 Pa. 449, 452, 50 A. 2d 354, we said that "Where a school board undertakes to terminate a contract with a professional employee, the procedure set forth in the [Public School Code] must be strictly followed, and failure on the part of the board to comply therewith renders the attempted dismissal abortive: *Swink's Case*, 132 Pa. Superior Ct. 107, 200 A. 200." It must, therefore, be

---

[2] See *Bragg v. Swarthmore School District*, 337 Pa. 363, 367, 11 A. 2d 152; *Jones v. Kulpmont Borough School District*, 333 Pa. 581, 583, 3 A. 2d 914; and *Goff v. Shenandoah Borough School District*, 154 Pa. Superior Ct. 239, 242, 35 A. 2d 900.

[3] See *Swink's Case*, 132 Pa. Superior Ct. 107, 113, 200 A. 200; and *Snyder v. Washington Township School District*, 117 Pa. Superior Ct. 448, 454, 178 A. 312. Cf. also *Kapustik v. Arnold City School District*, 177 Pa. Superior Ct. 268, 274-275, 111 A. 169.

taken as indisputable that the only way in which a professional teaching contract with tenure provisions can be terminated is by action of the *school board* in strict accordance with the procedure prescribed by the Code. From this it follows that the School District's obligations to the present plaintiff under his contract were not terminated by his suspension from duty by the Superintendent on November 20, 1953.

The only provisions of the Public School Code which deal with a teacher's suspension are contained in Section 1124. That Section, however, was designed for a school board's use in alleviating "pedagogical overstaffing in schools", as the majority opinion puts it, and envisions the return to duty of teachers, so suspended, if and when increased pupil enrollment should warrant. Such suspensions obviously entail a temporary, if not ultimately a permanent, cessation of the rights of a teacher under his contract, including his right to compensation, and require board action to make them legally operative in any given appropriate instance. But, certain it is that there is no power conferred upon the *superintendent of schools* to suspend a teacher under Section 1124.

The majority opinion reasons, however, as did also the Superior Court, that in addition to the school board's power under Section 1124 to suspend teachers, there is an inherent power in the board and in the superintendent of schools, as well, to suspend from teaching a professional employee whose presence in the school room is deemed to have become inimical to the welfare of the pupils. So much will readily be conceded. But, there is no inherent power in the superintendent, or in anyone else for that matter, to vitiate a school district's liability to pay a professional employee his contract salary except where the school board terminates the contract in an exercise of the power conferred up-

on it by Sections 1126-1130 of the Public School Code and acts in strict compliance with the procedure indicated by the Code. Section 1130 in particular negatives any suggestion of authority in a superintendent of schools to abate the salary of a teacher whom he suspends.

The last sentence of Section 1130 of the Code reads as follows: "In all such cases [i.e., charges looking to a teacher's dismissal] there shall be no abatement of salary or compensation." The majority dismiss that very important enjoinder out of hand by declaring that the provision is inapplicable even though the Section contemplates cases where charges may be sustained as well as dismissed. If, as the majority conclude, the inhibition means that "there shall be 'no abatement of salary' *only* where the final decision '*is in favor of the professional employe,*'" whence, then, does the superintendent derive authority to abate a teacher's salary upon the initiation of a suspension? To abate is to "do away with" or "to reduce or lower in amount" (Webster's International Dictionary, 2nd Edition, 1956). Until the board makes its final decision, it is obviously not possible for anyone to conclude in advance whether or not the charges will be sustained. Consequently, any diminution of salary antedating the board's decision in the premises is in clear contravention of the intendment of Section 1130. The appellant pointedly argues that it is both significant and enlightening that the legislature selected the term "abatement" rather than provide for "reimbursement" if and when charges should fail. The latter designation would have implied power to dock the teacher's salary pending the disposition of charges while the term actually employed negates the existence of any such power. The construction placed by the majority on Section 1130 renders the last sentence mere surplusage and, so, ig-

nores the mandate of Section 51 of the Statutory Construction Act that "Every law shall be construed, if possible, to give effect to all its provisions." The impact of the foregoing implicitly appears to have been perceived by the majority opinion when it finds it necessary to resort to an argument based on Kaplan's alleged failure to perform in order to justify the Superintendent's lopping off of his salary upon suspending him pending action by the Board on charges to be preferred. If the Superintendent possessed such power by virtue of Section 1130 of the Code, as the majority opinion implies, or any other provision of the statute, then to belabor the argument with an asserted failure of consideration, which the Superintendent and not the teacher precipitated, was patently a work of supererogation.

Notwithstanding that the plaintiff was ready, willing and able at all times to perform his duties as a professional employee and to comply otherwise with his contract of employment, the majority justify the deprivation of his salary for the period of his suspension by placing upon him the responsibility for not being permitted by the Superintendent to teach; and so, failure of consideration is ascribed to him with consequent loss of his right to the contract salary. In reality, the responsibility for not being permitted by the Superintendent to teach, thus visited upon the plaintiff by the majority opinion, is because of his refusal to testify, on a plea of the Fifth Amendment, concerning his alleged membership in the Communist Party three years before the hearing, viz., in 1950 and for several years prior thereto. That this is so is abundantly evident from a series of rhetorical questions in the majority opinion which imply that Kaplan was a member of the Communist Party and, consequently, an unfit person to teach. Thereby, his suspension by

the Superintendent *without pay* before his contract had been terminated by the Board is justified.

There is, however, a plain distinction between the situations where, on the one hand, a teacher's failure to perform his contract obligations is due to some overt act of his own and, on the other, where he is forbidden to teach and excluded from the school room by order of his administrative superior. Speaking for the Court of Common Pleas in this case, Judge FLOOD aptly noted this distinction in the following trenchant language,— "Of course where a teacher becomes physically incapable of performing his duties there is a failure of consideration, and if this physical incapacity is his own fault and clearly demonstrable, he cannot recover his pay after he ceases to perform even though he is not dismissed until later. *Hetkowski v. Dickson City School District,* 141 Pa. Super. 526 (1940). Likewise a teacher's pay may be stopped before dismissal when he refuses to perform his duty. *Commonwealth ex rel. Wesenberg v. Bethlehem School District,* 148 Pa. Super. 250 (1942). This, however, is a quite different thing from saying that the superintendent may decide that a teacher who is physically capable of performing his duties and has not refused to perform them, has become mentally or morally unfit to teach for the purpose of cutting off his pay. This would nullify the code provisions. Under the code this determination is to be made only by the Board of Education after notice and hearing. Until the Board dismisses him after hearing he is entitled to his pay."

The majority opinion further poses the following significant interrogatory: "Could the Superintendent of Schools, with the responsibility he owes the school children and their parents, permit on his teaching staff a member of the Communist Party, or, *what amounts to the same thing* (where school children are

in the picture) *a person who refused to deny the Communist Party activity* with which he stood accused?" (Emphasis supplied). In *Slochower v. Board of Higher Education of New York City,* 350 U. S. 551, 557, the Supreme Court took occasion to "condemn the practice of imputing a sinister meaning to the exercise of a person's constitutional right under the Fifth Amendment", saying, in that connection, that "The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury." Kaplan's refusal to answer the questions of counsel for the Un-American Activities Committee, in the exercise of his constitutional privilege against self-accusation, supplied no substantive proof relative to the matter embraced by the unanswered questions. Consequently, to bottom a denial of the salary due the plaintiff under his teacher-tenure contract upon an implication unwarrantedly derived from his refusal, on a plea of the Fifth Amendment, to answer the questions of the Congressional Committee constitutes deprivation of his property without due process: *Slochower v. Board of Higher Education of New York City,* supra.

The majority opinion further declares that "When a school teacher refuses to answer, upon being asked by his superior, whether he forms part of this [i.e., Communist] organization which is committed to catastrophe and destruction of all that in the Western world is accepted as good, decent, just, and conducive to wholesome happiness, this is evidence, as stated in the formal charges against Samuel M. Kaplan of 'a lack of professional fitness' of responsibility to the teacher's profession and to the school system, and such refusal to answer 'constitutes a wilful violation of the school laws of this Commonwealth.' " The fact

of the matter is, however, that in the *Beilan* case, supra, counsel for the Board of Public Education formally conceded of record that he could not point to any violation of the law to support the charge of "persistent and wilful violation of the school laws of this Commonwealth." Thereupon, that charge dropped out of the case and Beilan was dismissed solely for "incompetency" as evidenced by his refusal to answer questions concerning himself propounded by the Superintendent and by counsel for the Un-American Activities Committee. The evidence introduced to support the charges against Kaplan was of like character and extent. Apart from his refusal to answer questions, as already noted, nothing was shown from which he could have been found guilty of "persistent and wilful violation of the school laws of this Commonwealth." If the ratiocination of the above quotation from the majority opinion truly reflects this court's present thinking, then the indicated rationale of the opinion for the court in the *Beilan* case becomes a mockery.

The true legal situation which this case presents could not have been more cogently and succinctly stated than was done by Judge FLOOD when he said,—"It would seem to be obvious that a teacher may be suspended from the performance of any duties under certain circumstances pending a hearing on charges of dismissal, as was held in *Intille v. Hoyer,* supra. Certainly if by reason of some immoral action or some definite indication of mental illness, it would be unsafe or improper to have the teacher conduct classes or dangerous to his pupils that he should do so, the superintendent would be remiss if he did not remove him from the classes. *But until the teacher has had the hearing provided for in the code, and there is a proper determination to dismiss him, his pay cannot be cut off.* This is of the essence of tenure provisions,

and is part of the price the school system has to pay for the advantages it derives from teacher tenure" (Emphasis supplied).

No depiction of the loathsomeness of the Communist plague can safely be permitted to extenuate a disregard for the above-quoted sound conception of the applicable law, especially where, as here, there is involved a fundamental legal principle upon which the right of private property in part depends, namely, the inviolability of a contract. In our zeal to scotch Communist affiliates and sympathizers, we must ever be careful not to impair the right of private property or any other of the time-honored civil rights of the individual, no matter who he may be. Unless we so act, we will but comfort the hopes and aid the machinations of Communist propagandists and adherents.