**Soter Estate**

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

*Ostroff, Lawler & Baker,* for exceptants.

*Herbert W. Salus, Jr.,* Special Assistant Attorney General, contra.

*Joseph Rappaport,* for accountants.

KLEIN, P. J., April 24, 1964.—This is another in a long line of cases in which attorneys selected by agencies of the U.S.S.R. and other communist-dominated countries are endeavoring to induce the court to transmit funds from the estates of Pennsylvania decedents to the nationals of these countries.

The present case involves beneficiaries who reside in Albania. There is no problem concerning their identity or domicile. This has been confirmed in the adjudication.

### Representation of Albanian Nationals

Ostroff, Lawler and Baker, a Philadelphia law firm, entered their appearance as counsel for the Albanian nationals. Judge Bolger, at a pretrial conference, requested counsel to describe in detail the manner in which they were employed to represent these people.

At the hearing which was held subsequently, it developed that Wolf, Popper, Ross, Wolf and Jones, the New York law firm which forwarded the matter to Ost-

roff, Lawler and Baker, were engaged by a private society in Albania, known as Shoqeria Komisjonaria, which charged for its services and which was subject and responsible to the Albanian government.

Judge Bolger concluded that counsel had failed to establish that they in fact represent the true parties in interest and ruled that it would be improper to allow them "any counsel fee at this time or at any time in the future until they have furnished the court with proof of their authority . . ."

Counsel filed exceptions to these conclusions.

The practice of law is a learned profession and not a business. Consequently, a different and higher standard of conduct is applicable to lawyers than is expected in the market place. In the case of In re Disbarment of Tracy, 197 Minn. 35, 43 (1936), the court said:

"The point is in the fundamental difference between any commercial business and a profession. The vocation of a lawyer is a profession. In consequence, his conduct as attorney, counselor, and advocate is to be measured not by the indefinite, still developing, and largely unwritten standards of trade and counting-house but by those of his profession, which, while they have not reached their ultimate state, have yet attained the development and degree of formulation evidenced by the Canons of Ethics."

By admitting an attorney to practice the court presents him to the public as worthy of its confidence in all his professional duties and relations. See In re Samuel Davies, 93 Pa. 116 (1880). It is incumbent upon the court at all times to make certain that its continued confidence in the integrity of a member of its bar is justified. To this end it should *sua sponte* inquire into situations arising between attorney and client which appear to warrant explanation. In the present case counsel have entered their appearances for persons who apparently are illiterate peasants, with whom they

have obviously had no personal contact. Their negotiations have been conducted through a government-dominated agency and a New York law firm under an agreement which was obviously made without the knowledge or consent of the clients, whereby 30 percent of the amounts distributable to the beneficiaries is arbitrarily payable to the agency and counsel, regardless of the nature or extent of the legal services rendered.

Since solicitation of business by attorneys is forbidden by the Canons of Professional Ethics, it is not only the right, but the duty of the court to insist that counsel for the Albanian citizens justify their representation. A lawyer has no right to act in behalf of anyone without that person's specific and personal authorization. It is incumbent upon counsel, when his authority is subject to question, or not clearly established, to satisfy the court fully that his representation was properly authorized and obtained with the client's consent, freely given and after being made fully aware of all attending facts and circumstances.

In our opinion, the exceptions to Judge Bolger's action in compelling counsel to disclose the manner in which they were employed, are completely devoid of merit. On the contrary, we believe it was Judge Bolger's judicial duty, under the factual situation existing in this case, to make a full and searching inquiry to ascertain the circumstances attending counsels' appearance in these proceedings.

We are also in full agreement with the auditing judge that neither the local law firm, nor their New York correspondents, have satisfactorily established that they were selected by the beneficiaries to represent them, freely and voluntarily. On the contrary, it seems evident that they were selected by an agency of the Albanian Government, without consultation with the beneficiaries, who have no right to select counsel of their own choice independently, or to arrange for

their counsel's compensation. It also seems apparent to us, as it did to Judge Bolger, that the selection of counsel in this case constitutes part of the over-all plan for the suppression of the liberties of the citizens of Albania, which precludes the actual use, enjoyment or control of any funds which may be transmitted to them from the estates of American decedents.*

### Revocation of Decree Authorizing Transmission of Funds.

On July 3, 1963, Judge Bolger, the auditing judge, entered a decree which provides:

"AND NOW, July 3rd, 1963, pending the continued audit and until further order of Court, the executors are ordered and directed to remit to Vasile Soter $200 quarter-annually. The remittance is to be made through the American Express Company and the executors are ordered to obtain a receipt for each remittance in a form which satisfies them that the money has been received before any further remittance shall be made."

In his readjudication, Judge Bolger concluded, after an extensive hearing at which considerable testimony was received, that the proof that the $200 initially sent to Vasile Soter, in Albania, in accordance with this decree, was "totally unsatisfactory to the extent that it fails completely to demonstrate that Mrs. Soter, an illiterate person, actually received, had possession of and benefited by the remittance." He, therefore, revoked the decree which he had entered previously.

We are all of the opinion that the record fully justifies this conclusion.

In studying cases involving nationals of the so-called Iron-Curtain countries we must at all times keep in mind the purposes sought to be accomplished by the Pennsylvania legislature when it adopted the Act of

---

* See opinion of Shoyer, J., in Sochanczak Estate, 29 D. & C. 2d 609 (1963).

July 28, 1953, P. L. 674, and section 737 of the Fiduciaries Act of April 18, 1949, P. L. 512, which is a substantial re-enactment of the 1953 Act. These statutes were intended as custodial measures to safeguard the interests of the heirs of Pennsylvania decedents who reside in countries under dictatorial domination where their inheritances would be in danger of being confiscated by the foreign government. Seé Kurz Estate 32 D. & C. 2d 453.

We would be naive, indeed, if we failed to recognize the true nature of the various communistic dictatorships which have engulfed much of the world. In Belemecich Estate, 411 Pa. 506 (1963), Mr. Justice Musmanno, cited with approval the following statement made by President Judge Roberts, now Justice Roberts, in Dopierala Estate, 7 Fiduc. Rep. 262 (1957) :

"Common knowledge and experience indicate that funds transmitted to residents, subject to police state absolutism, rarely reach the intended individual. More frequently the funds are wholly or partially confiscated by unfair rates of exchange or by other direct or indirect police state pressures or devices exerted against the intended recipient or his family, either by the government itself or by its unscrupulous officials or functionaries. *Of these deplorable facts we take judicial notice* and upon careful consideration of all the attending circumstances, as they now appear, we find that if distribution to this beneficiary were made, she would not have 'the actual benefit, use, enjoyment or control' of her inheritance."

See also Kaplan v. Philadelphia School District, 388 Pa. 213, 224-226 (1957) ; Albert Appeal, 372 Pa. 13, 19-22 (1952).

Of all the European communist police states, Albania is governed by the harshest and most fanatical tyrant and its nationals are subjected to perhaps the greatest evils and excesses. The United States has no diplomatic

relations with this country. Hence, it is almost impossible, literally, to learn the truth concerning what is happening to its citizens*. In view of these circumstances, we would be derelict in our duty if we did not subject all transactions with this nation to the most careful scrutiny.

Moreover, we regard Judge Bolger's decision as interlocutory in nature and without prejudice. If conditions in Albania change or if the court can be given assurance that a method of transmitting the funds can be adopted which will guarantee that the Albanian nationals will actually receive the money and have the use, benefit and enjoyment thereof, the matter may again be presented to the court for consideration.

## *Orphans' Court Rule 69.6*

On June 21, 1963, this court adopted Rule 69.6, which provides that in cases in which distributees residing in countries in which the Secretary of the Treasury of the United States has determined that there is not a reasonable assurance that the payee of checks or warrants payable from government funds will actually receive the remission and be able to negotiate it for full value, such determination shall be *prima facie* evidence that the beneficiary would not have the actual benefit, use, enjoyment or control of money or other property distributed to him by a fiduciary and the burden of proof shall rest upon any party who alleges otherwise. Exception has been taken to the application of the rule

---

\* The following extracts are taken from a report from Radio Free Europe entitled "Albania Buried in Economic Morass," which appeared in The Philadelphia Inquirer, Sunday, March 29, 1964:

". . . Enver Hoxha rules his mountainous nation with a ruthless and bloody hand that shows no signs of slackening its grip.

"Hard information about Albania is even more difficult to gather than about other Communist states, . . .

"Albania's staggering economy desperately needs hard foreign currency to survive . . ."

in this case as an attempt by the court to assume the functions of the legislature and as unconstitutional, *ex post facto* rule making.

There is obviously no merit to these contentions. What better source can a court look to for guidance in matters pertaining to conditions in foreign countries than the Secretary of the Treasury of the United States, who is charged by the Congress with the responsibility of determining these facts. But in any event, the rule which is being challenged, is only procedural in nature. It does not change the basic rights of the nonresident distributees. Since, as has been indicated heretofore, we may take judicial notice of the fact that funds transmitted to residents in communist-dominated countries rarely reach the intended individual, we are certainly justified in adopting and applying a procedural rule which places the burden upon those who maintain that that which is common knowledge concerning the conditions existing in these police states is not correct or has been changed, to prove their contention.

Our function, as a court, is not to attempt to chart or interefere with the foreign policy of the United States. This is exclusively within the province of the Federal government. Our responsibility is to make certain that nonresident beneficiaries have the actual use, enjoyment or control of the money or other property distributable to them, as prescribed by our statutes. Our decisions in each case must depend in a large measure on the political climate which exists in the country in which the distributee lives, at the time of distribution.

The internal affairs of many nations of the world are in a constant state of flux. This is particularly true of the so-called Iron-Curtain countries. In some nations, such as Poland and Bulgaria, internal conditions have improved considerably, and more and more liberties

and an expanding measure of freedom are being conferred upon the people. This, in some cases, includes sufficient relaxation of monetary restrictions to indicate that they are giving their citizens more generous privileges with respect to the use and enjoyment of money and property which may be sent to them. From what we read in the public press the internal situation in Hungary is improving, also. In other communist countries, such as Albania and Red China, however, conditions have deteriorated and the pressures on the people have been intensified.

Any study of world affairs must lead to the conclusion that the internal conditions of nations vary from country to country and from year to year. Our treatment of a situation with respect to a communistic nation in which the stranglehold on its people has been relaxed may be completely impractical and unworkable with regard to the nationals of a country in which harsh police-state measures are still being rigidly exercised.

We share the hope, with all responsible peoples, that the "Cold War" will thaw, and that the nations of the world may find a way to live together in peace and harmony. Until this happy day arrives, we must view events realistically. And this requires us to conclude that the citizens of Albania are being deprived of their rights and liberties by a small group of despotic fanatics and that every possible precaution must be taken to make certain that the distributive shares of the estates of Pennsylvania decedents awarded to Albanian nationals are not confiscated by their communistic overlords.

The exceptions are dismissed without prejudice to the rights of all of the beneficiaries to present to the court, at any time in the future, satisfactory proof that they will receive the actual benefit, use, enjoyment or control of any funds transmitted to them.